**In re CENTURY INNS, INC.**

**Bankruptcy No. 8407617 SC.**

United States Bankruptcy Court, S.D. Mississippi.

Jan. 3, 1986.

508

William D. Bethea, III, Gulfport, Miss., Robert A. Byrd, Biloxi, Miss., Owen T. Palmer, Jr., Gulfport, Miss., for plaintiff.

Henry F. Laird, Jr., Kenneth L. Krogstad, Gulfport, Miss., for defendant.

ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATIVE TO OBJECTIONS TO SECURED CLAIM OF GULF NATIONAL BANK AND REQUEST FOR SUBORDINATION OF CLAIM BY UNSECURED CREDITORS COMMITTEE OF CENTURY INNS, INC., SAGE CONSTRUCTION COMPANY, INC. AND GOVERNMENT STREET LUMBER COMPANY, INC.

T. GLOVER ROBERTS, Bankruptcy Judge.

This matter came on for Trial on the objections to the granting and allowance of

a secured claim in the above proceeding to the Gulf National Bank (Gulf National or Bank), the objections being by the Unsecured Creditors Committee of Century Inns, Inc. (Unsecureds), Sage Construction Company, Inc. (Sage) and Government Street Lumber Company, Inc. (Government Street). The Court has now reviewed the lengthy and voluminous amount of both oral and documentary evidence and the applicable law. For the reasons cited below in the Findings of Fact and Conclusions of Law, the creditor objections above are found to be not well-taken and are overruled and denied. Likewise, the claim of Gulf National is allowed as described below.

## INTRODUCTION AND BACKGROUND

This Bankruptcy Proceeding was commenced by the voluntary filing of a Chapter 11 petition by Century Inns, Inc. (Century) on May 22, 1984. The sole owner of the common stock of Century, a Mississippi corporation, was H. Templeton Fowlkes (Fowlkes). Fowlkes, was at that time an entrepreneur and developer, who pursued his various projects through a large number of corporations, limited partnerships and joint ventures. Century, one of those projects, had as its sole purpose in being, the building and development of the Quality Inn Motel on Highway 90 in Biloxi, Mississippi. As the sole owner of Century, Fowlkes exercised overall management and decision making responsibility and control of the corporate business, although the undisputed facts are that the corporation did have a number of other employees. At the time of the filing of the Chapter 11 petition, the only asset of the estate was the motel in question, and with this Court's approval, the motel was sold, after notice and a hearing, with all lien claims being transferred to the proceeds of the sale. The proceeds are presently on deposit, bearing interest, in the registry of the Court.

The litigation here is not a question of allowability of claims, but rather, one of lien priority. The objectors advance two separate theories as grounds for relief in their pleadings. First, under §§ 502 and 506 of the Bankruptcy Code, the objecting creditors claim grounds for setting aside some part or all of the claim of Gulf National Bank to a secured lien on the subject property. The second theory advanced by the objecting creditors is that Gulf National's lien on the subject property should be equitably subordinated to the lien of objecting creditors, and particularly, to that of Sage Construction Company, Inc. and the Unsecured Creditors Committee, under the provisions of § 510(c) of the Bankruptcy Code. Gulf National, to be expected, strongly resists the objections of these creditors, claiming that its claim primes all other claims and was perfected by the proper execution, filing and recording of the necessary security instruments, and that it followed the appropriate legal guidelines reasonably required of the bank in the exercise of its responsibilities under the construction loan agreement subject hereto. The Bank argues that its secured claim should be recognized by this Court and placed in the primary position for distribution of any funds available in this proceeding as result of the sale of the motel in question.

To understand the issues presented for decision, it is necessary that some background and factual history be provided. The hearing on the case was replete with such information in the form of evidence, and the Court therefore incorporates these items into the following Findings of Fact:

## FINDINGS OF FACT

In order to provide financing for the Quality Inn Motel construction project, Fowlkes, through Century, approached Gulf National for the purpose of persuading it to become the construction lender on the project. After negotiations between the parties (Century and the Bank), Gulf National agreed to provide construction financing on the project and on July 20, 1983, Gulf National Bank entered into a construction loan agreement with Century Inns, Inc., Fowlkes and Richard Senturia.

Under the terms of the construction loan agreement, Gulf National agreed to provide construction financing for the construction of the motel in the amount of $2.025 million dollars. That particular agreement set forth the rights and obligations of the parties. Sage Construction Company, Inc., an Alabama corporation, qualified to do business in the state of Mississippi, was retained by Century Inns, Inc. and Fowlkes to be the general contractor on the job. In accordance with construction loan requirements, Century also retained the services of Terrill J. Moran, Jr. as the engineer on the project, whose responsibility and function was to provide certification that the work covered by applications for progress payments under the construction loan had been completed in accordance with the contract. The relevant portion of the construction loan agreement in this regard is found on page 4 at paragraph 4 and provides in pertinent part as follows: "Lender agrees to make progress payments as certified by Terrill J. Moran, Jr., ...., acting as 'Engineer' in an amount equal to ninety per cent (90%) of the value of the labor and materials *in place,* less credit for any sums theretofore advanced, as evidenced by paid bills or invoices and certificates of completion signed by the owners, general contractor, project inspector and title company, ..." (emphasis supplied). In paragraph 7 of the agreement, it further provided that "all advances made by lender hereunder will be in favor of owners and the title insurance company designated by owners." It is noted that Sage was not a party to this agreement. At the time of the entering into the construction loan agreement, Century had received a permanent loan commitment letter from Pine Belt Savings and Loan Association and its (participant, Union Savings Bank of Long Island). For one reason or another, that permanent loan commitment was not utilized by the debtor, and a second permanent loan commitment was made by Northlake Federal Savings and Loan Association on April 16, 1984, in writing, in the amount of $3,400,000.00.

Pursuant to the requirements of the construction loan agreement, Century began construction on the project, after acquiring the land and clearing the area. As the project began moving through the construction phases, draw requests on the loan were made by Century directly to Gulf National by written letter. Each draw request was accompanied by the requisite engineer certifications of percentage of progress completed and in place. The record reflects the number of draws, the amount of the draws, the date of the draws and the total amounts advanced by the bank under the draw procedure agreed upon.

The specifics of the procedure were as follows:

(1) Century Inns, Inc., through an authorized officer, usually through Leslie C. Williams, a vice president, would prepare a letter requesting a construction draw, indicating on the letter the number of the draw involved. It was indicated in that letter that the closing attorney was being advised separately of the draw request by Century to Gulf National. Attached to that letter on each instance would be an original and one duplicate original of the certificate and application for payment, being a form AIA document G702, covering each of the buildings under construction on the property. That document was signed by a representative of the contractor, Sage Construction Company, Inc. and dated. The application indicated the present status of the account for the contract, with the original contract sum being indicated, contract sum to date with change orders, total amounts completed and stored to date, per attachments, retainage kept and total earned less retainage, less previous requests and certificates for payment. The form indicated the amount of current payment due and requested. The following language appears on the face of that application and certificate:

"The undersigned contractor certifies that the work covered by this application for payment has been completed in accordance with the contract documents,

that all amounts have been paid by him for work for which previous certificates of payment were issued and payments received from the owner and that the current shown herein is now due."

Each draw request was accompanied by this document, and as stated, executed by a representative of the general contractor, Sage. Also appearing on the face of that document was the following statement:

"In accordance with the contract and this application for payment, the contractor is entitled to payment in the amount shown above."

That statement was made by the engineer, Terrill J. Moran, Jr., and executed at the time of each draw request being made. Attached to the cover document were continuation sheets for the main building and eight separate buildings involved in the motel project. The continuation sheet indicated a number of columns showing item number, description of work, scheduled value, work completed (previous applications and this application), percentage of the total, total completed and stored to date, balance to finish and retainage. As each draw was processed, of course, these amounts would increase as the project moved through construction toward completion. The evidence indicated that after the construction loan was approved, Century made arrangements with Sage Construction, although in name the general contractor, whereby Sage was to handle only certain construction work with certain other work being left out of the contractural relationship between Century and Sage. These latter specified matters were handled separately and were directly contracted for by Century. The engineer, Moran, would date and execute a letter, during the draw procedure, concerning those items that were completed outside of the Sage contract, which letter's language related to the percentage of completion both as to dollar amount and work completed. For example, in viewing the attachments to draw request #9, there is attached the Moran statement which is dated March 5, 1984 and reads as follows:

"The total cost for guest rooms, wall vinyl and carpet, including materials and installation on the above referenced project is $60,000.00. I hereby certify that 83% is complete and installed; therefore, $50,000.00 is due and payable to Century Inns, Inc., from construction funds."

This type letter appears attached to the various construction draws throughout the time of the disbursement of these funds. Also attached to the certifications by Moran on the items falling outside of the Sage contract would be invoices indicating the amounts due. Forms from the AIA were not used on this type draw requests, but rather, the statement above appeared to be the method used by the inspecting engineer on these items.

(2) At the time of each draw request, this entire package would be sent to Gulf National. After review of the draw documents, the bank would then issue an instruction letter to R. Christopher Wood (Wood), the closing attorney, and would forward with the instruction letter for the particular closing, a cashier's check representing the advance requested.

(3) The closing attorney, upon receipt of the instruction letter from Gulf National and the draw check, would then conduct a closing and disbursement of the funds forwarded from Gulf National. At the time of closing, Wood prepared a written closing statement for each draw. The written closing statement, in evidence, on each draw, indicated the gross amount of the loan, the amount of each advance, including closing costs and total of advances in relation to the overall construction loan. The statement also indicated disbursements per draw. That closing statement was signed by a corporate representative of Century Inns, and when appropriate, a corporate representative of Sage (usually Kenneth E. Hatcher, Vice President) and the closing attorney. Also at the time of each closing, the closing attorney had the owner, (Century) and the contractor (Sage) through their authorized representatives, sign affidavits, sworn to under oath in writing. The affi-

ants stated in each of these draw affidavits:

"That he has been paid in full under his contract for such work and all architects, engineers, surveyors, attorneys, subcontractors, materialmen, and laborers have been paid in full to date so that no liens exist or may have reason to exist."

After the execution of these documents, and upon being satisfied that no liens or other encumberances had been filed for record against the property or the job, the check was disbursed from the trust account by the closing attorney, and after the instructions (described herein below) given by Gulf National to Wood during the construction process of the payee were complied with (early in the process, it was Century Inns, Inc. solely, and later in the process, the checks were made payable to Century Inns, Inc. and Sage Construction Company, Inc., the reasons for this change being described herein below). In the instance of the draw checks being made payable to Century Inns, Inc. and Sage Construction Company, Inc., there appears on the reverse of these draw checks, all of which are in evidence, typed endorsements, the endorsements being manually signed by authorized representatives of the corporation involved. For example, check number 143 of the closing attorney Wood, dated January 31, 1984 is made payable to Century Inns, Inc. and Sage Construction Company, Inc. in the amount of $55,692.00. The check is for the seventh draw on Century Inns. The check is endorsed by Leslie C. Williams, vice president of Century Inns and Kenneth E. Hatcher on behalf of Sage Construction Company, Inc., with the notation "payment in full through seventh advance". The check was apparently deposited into a Fowlkes account entitled Sunsource after the endorsement by Sage. The distribution of the monies to Century or Sage under this check does not appear on the distribution sheets or closing statements, although clearly, Sage was a joint payee on the check and endorsed the check.

(4) The last advance or draw under the construction loan occurred on March 21, 1984. The draw amount was $136,835.04, which was also the amount disbursed. The check was made payable to both Century and Sage, with $2,756.77 of the draw being paid to Refrigeration Supply, Inc., an amount requested by Century in its draw request to be paid to that supplier. The remaining proceeds, $134,078.27 constituted the balance of the disbursement. The closing statement indicates $220,274.55 being held by the mortgagee, which presumably is the 10% retainage. Coupled with closing costs of $60,750.00, the total disbursements under the construction loan then amounted to $2,025,000.00 on that date to cover the total amount of the original construction loan. On that date, James L. Sage signed the usual affidavit on behalf of Sage Construction Company, Inc. relating to having been paid in full, etcetera, as cited and described above. The checks were negotiated in due course, the trust account check of the closing attorney indicating endorsements on the reverse of the check by both Century and Sage. The Sage endorsement was by James L. Sage, President. There is no notation of deposit in any particular account below the two endorsements. In evidence as bank exhibits are other documents in existence at the time of the closing, being the instruction letter of Gulf National Bank dated March 20, 1984, a copy of the last check and a letter from Century signed by Leslie Williams, for the draw request. The net amount of the request as stated above is $136,835.04. The March 19 letter indicates that the net amount requested by Sage Construction on its contract was $25,856.20. Other items were included for payment in this draw request, per the Century letter. Site work completion was due and payable in the amount $27,500.00 and landscaping in the amount of $16,666.66. Also included in that draw requests was $10,000.00 for guest room wall and floor covering, guest room furniture and guest room air conditioning and heating systems. Accompanying the draw request is the certificate of Terrill J. Moran, Jr. dated March 19, 1984, stating that the installation of guest room's wall and floor coverings in-

cluding material and installation is 100% complete with $10,000.00 being due and payable at that point in time. Also accompanying the draw request is a separate written certification from Moran stating that "I have inspected the site work at the above referenced project and hereby certify that it is 100% complete and in substantial conformance with the approved plans and specifications." A similar statement regarding certification on landscaping being 50% complete also accompanies the draw request. The Refrigeration Supply bill described above was submitted for payment, and all AIA documents, as applications and certificates for payments, also accompanied the draw requests with signatures by the authorized representatives of Sage, as well as Moran, with the appropriate representations and affidavits as described above.

(5) Century hand delivered, according to the documents in evidence, a letter to John Rosetti, Vice President of the Gulf National Bank and the bank officer assigned to the Century account at that time on March 22, 1984 stating as follows:

"The draw processed this week will be the last draw required on the Biloxi motel project.... We have notified all suppliers and subcontractors to notify us of the final amounts owing so they can be paid in full prior to closing the permanent loan. Some of the contractors-suppliers, including Noble Steel, will so notify us and you with stop notices. The estimated time for final completion is ten work days from tomorrow."

At this point, the construction proceeds had been disbursed, less retainage. The documentation indicated suppliers had been paid to date. Appropriate certifications and written affidavits to that effect have been received by the construction lender. No liens had been filed against the job, nor had any stop notices been provided to either the disbursing attorney or by the construction lender at that time. On April 16, 1984, Northlake Federal Savings and Loan Association of Covington, Louisiana issued its written permanent loan commitment in the amount of $3,400,000.00, some one mil-

lion dollars in excess of the construction loan. A copy of that letter is in evidence. The permanent loan never closed, and no money was issued by the permanent lender for the payment of the amounts referred to in the March 22 letter of Century referred to immediately above. Also, none of the remaining bills due to Sage or the suppliers contracting directly with Century were paid. It is now known that those amounts owed are substantial. It is also known that Sage, who is also now in Chapter 11, had a number of subcontractors whom they had not paid.

(6) Johnny Noble of Noble Steel a subcontractor to Sage, and called by Sage as a witness, testified that on March 21, 1984, he hand delivered a letter to Tem Fowlkes which was a demand letter and stop notice for the amount of $69,867.00. That letter is in evidence as Sage Exhibit #13. Mr. Noble testified that he sent certified copies of that letter also to Sage Construction Company, Inc., its attorney, to Gulf National Bank and its attorney. There is no evidence that this stop letter from Noble was received by Gulf National or the closing attorney prior to the last disbursement described above. Mr. Noble testified that both Sage and Fowlkes told him that a March 21 draw would provide sufficient money to pay the amount due Noble. He was not paid from those funds described above as having been disbursed. On cross-examination, Noble testified that he was not aware that Gulf National construction disbursements were being made payable jointly to both Century and Sage. Noble testified that "He was surprised", when he learned that such was the case. In any event, Noble remains one of many unpaid subcontractors of Sage Construction Company, Inc. at this time.

(7) On May 22, 1984, Century filed for Chapter 11 protection in this Court. The docket in this case reflects that Gulf National Bank filed its proof of claim as a secured creditor for the construction loan, and cited both deeds of trust and U.C.C. filings as being evidence of its secured position, insofar as the collateral relating

to the motel was concerned. On July 27, 1984, this Court issued its Order appointing the Unsecured Creditors Committee in this action, with Sage Construction Company, Inc., represented by James L. Sage, being a member of that committee. Jim Sage was apparently elected chairman of that committee, since he signed the application to appoint counsel to the committee as chairman, on August 2, 1984. During the negotiation period for the sale of the motel, which was later consummated as described above, that committee and Mr. Sage, according to the docket in this case were quite active in these negotiations. Apparently, Mr. Sage later resigned from that committee, since Sage Construction filed its own objection separate and apart from the unsecured creditors claim, claiming to be secured pursuant to a construction lien it filed. The record reflects that on March 14, 1985, Sage Construction Company, Inc. filed its objection to the claim of Gulf National Bank, claiming that "Gulf National Bank was negligent in making disbursements pursuant to its construction loan in that construction disbursements did not actually go into construction of the motel. Gulf National Bank was furthermore negligent in failing to properly administer and monitor disbursements of this construction loan, after being placed on actual notice that its construction loan disbursements were actually being diverted and utilized for other purposes by the debtor and were not being paid to or for the benefit of the general contractor, its subcontractors and other suppliers, laborers and materialmen of the Century Inns motel project." Sage further claimed that "The negligent acts and omissions of Gulf National Bank in administering its construction loan to the debtor when it knew, or should have known through the exercise of reasonable diligence, that the construction loan disbursements were not being utilized to pay contractors and materialmen, gives the bank an unfair position and is detrimental to the interest of the general contractor, Sage Construction Company, Inc., its subcontractors and other materialmen and suppliers of the Century Inns project. The bank's claim should be subordinated to the interest of all creditors in the above encaptioned estate, pursuant to the provisions of § 510(c) of the Bankruptcy Code." On March 15, 1985, the Unsecured Creditors Committee in this action joined with the Sage objection stating that "The claim of the creditor, Gulf National Bank, is objectionable, and no relief should be afforded the Gulf National Bank prior to determination of the exact lien position to be granted to Gulf National Bank by this honorable Court." No subordination relief was sought at that time, although at the time of the Pre-Trial Conference, it was agreed that the position enunciated by Sage Construction would be the position argued by all counsel opposing the Gulf National Bank lien and secured position. Government Street Lumber in its prayer, pursuant to its objection to the Gulf National Bank claim requested that "This Court make proper inquiry to determine what part of the principal funds claimed by Gulf National Bank under its construction deed of trust actually went into the purchase of the land and the construction of the improvements located thereon and to further determine whether the Gulf National Bank used reasonable and ordinary care and diligence in disbursing the construction loan funds; and to the extent that the funds were not used in said project and or reasonable diligence was not exercised by the said bank in the disbursement of funds, the alleged secured claim of the Gulf National Bank should be allowed to the extent as authorized under the statute and the case laws of the State of Mississippi." In addition, this particular claimant, Government Street Lumber, also prayed that its claim which has been "duly filed herein seeking a secured position as a valid mechanic's and materialmen's lien holder be approved and allowed as a secured claim and that the rights of all secured creditors be properly adjudicated as to their priorities by this Court."

In its effort to prove at trial that Gulf National failed to monitor disbursements of the construction loan or to ascertain that

the construction disbursements were going into construction of the hotel, Sage called several witnesses, one being Jim Sage, the now president of the corporation. Under oath, Mr. Sage stated that the affidavits that he had signed representing to the closing attorney and to the construction lender that all bills were paid and amounts due had been paid his company were in fact false, and that he knew about the falsity of the statements at the time he signed the affidavits under oath. Further, Jim Sage testified that, although he endorsed some of the checks which were made payable jointly to Century and Sage, his company did not receive the funds that they were supposed to receive at closing. Mr. Sage stated to the Court that "I was not telling the truth then, but I am now".

An examination of the testimony of this witness raises serious questions in the mind of the Court as to this witness's credibility. He testified that he was President of the corporation and was aware of the business affairs of the corporation. In particular, Jim Sage stated that the fixed cost contract which had been presented by Century to Gulf National at the time of the signing of the construction loan agreement as the contract between the general contractor and the owner of the project was in fact not the correct contract, but that a cost plus contract later introduced into evidence was the appropriate contract. The evidence is clear that Century did apparently use two contracts. A purportedly valid contract (or copy) was submitted by Century to Gulf National, this contract being the one on which Gulf National relied. It was the first contract and was a fixed cost contract between Century and Sage and covered the entire motel construction. The evidence indicates that Sage did in fact sign a cost plus contract subsequent to the delivery of the first document to Gulf National from Century. That later contract reduced the scope of the work to be done by Sage, as shown above. At stated, Gulf National relied on the fixed cost contract, and was apparently unaware of the cost plus arrangement later entered into. Although Jim Sage testified that "He knows

nothing about it" (referring to the fixed cost contract), and his father Louis B. Sage, also a principal in the construction company, also testified that he was also unaware of the fixed price contract, the documentary evidence in the file reflects otherwise. The docket and the proofs of claim were by agreement of all parties made part of the record in this action. On November 16, 1984, Sage filed its original proof of claim and attached thereto a copy of the agreement between Century and Sage for the cost plus fee contract. Attached to that contract and the proof of claim is a copy of a letter dated September 1, 1983 from Steven N. Avery, the then president of Century Inns, Inc., addressed to Louis B. Sage, as president of Sage Construction Company, a copy of which is marked Exhibit A and attached hereto. The letter is a proposal for the cost plus contract and is accepted by Sage Construction through the written signed acceptance by James L. Sage, V.P.. This letter states that "This contract is in addition to that one executed at a fixed price. This contract supersedes the terms and conditions of the fixed price contract with two notable exceptions ...". On the basis of this evidence, the Court finds that not only was the claimant here, Sage Construction, charged with actual knowledge of the fixed price contract by virtue of this agreement, but in fact, the individuals are found to have specific knowledge of both contracts.

In his testimony, Jim Sage later stated that "I do not know what the bank relied on to advance its loan proceeds." He also stated that "I did not know how much construction money Gulf National Bank actually provided". In reviewing the documentary evidence described above in regard to closing statements etcetera, it is clear as a matter of fact that Sage Construction Company, Inc. of which Jim Sage was a corporate officer, had clear and absolute knowledge of the methodology by which the draws were being made, per the documents and transactions described above. In fact, Jim Sage actually signed not only the affidavits certifying payments

were up to date, but also the AIA forms on work progress. When he was asked on the witness stand what Mr. Moran (the engineer) was doing on the job, Jim Sage stated: "Making sure work was completed and work was being done in accordance with plans and specifications." Both Jim Sage and his father, Louis Sage, also a corporate officer, testified that Ken Hatcher, the brother-in-law and son-in-law, respectively, of the two Sages here, was in charge of the financial operations of the company in his capacity as comptroller and secretary-treasurer. As a matter of fact, the documents and evidence reflect that Mr. Hatcher, (who did not testify in this proceeding,) actually signed a large number of the documents on the disbursements. The Court finds that the Sage corporate entity was not only charged with, but also, had actual knowledge through its corporate officers of the methodology by which the bank derived its information on construction draws. The Sage testimony here clearly lacks credibility.

To demonstrate even another example of the lack of credibility of testimony, Louis Sage, in response to a question about the purpose of AIA forms on the job, stated that the AIA forms reflected all work done on the job to date, per the date of the document and the dollars spent. The Court finds that Sage Construction, through this testimony, had knowledge of the overall construction and payments process, which conflicts with Jim Sage's claims and testimony.

Sage Construction went to Gulf National independent of Century Inns for a loan of $200,000.00. Sage would have us believe that Gulf National at that time was given actual notice or should have known that the Century Inns job was not being handled properly, and that in fact, the monies were not being paid to Sage as due. Again, the record reflects otherwise. Gulf National Bank gave its written commitment for $200,000.00 loan to Sage Construction on October 27, 1983, referencing funding as requested by letter from Sage dated October 21, 1983. An examination of that October 21st letter from Sage Construction

Company, Inc., signed by Kenneth E. Hatcher, a corporate officer, states that the $200,000.00 loan will be used to pay unnamed suppliers for lumber and materials received in the amount of $50,000.00, site preparation and slab pouring at the Century motel site in the amount of $30,000.00, asphalt at Sentury Park, Waveland in the amount of $20,000.00 and bonding and licensing and site work preparation for the Fleur de Lis project in the amount of $60,000.00. Nothing in the written instruments indicates any problem with Sage cash need on the motel construction job. The only indication, of course, of any Century motel involvement would be cash needed for site work preparation. There is no evidence in any of these letters from either the Bank or Sage that indicates notice being given to the bank where it knew or should have known of problems on this basis. This fact contention by the claimants here is simply without merit.

In an effort to try to show that Gulf National, or the disbursing attorney for the construction loan had either actual or constructive knowledge of problems with the Century Inns payments to the contractor or to subs, Sage and the other claimants called a number of witnesses to the stand. The President of Gulf National Bank, Ward Faulk, was asked about his knowledge of indications from Mr. Hatcher of problems by Sage receiving its money in the construction draws. Faulk testified that Hatcher came to see him in the fall of 1983 and said that Sage was not being paid by Century Inns, and that the affidavits were being signed as an accommodation, but they were not true. Faulk testified that he told Hatcher to go to a lawyer and get his lawyer to send him a letter, saying Sage was not getting paid in order to formalize the matter. Faulk testified that the bank never received a letter from Hatcher or Sage in this regard, nor did its closing attorney. However, Faulk did testify that shortly thereafter, as a precautionary measure, Gulf National instructed its closing attorney to change disbursement practices on its checks, by changing the name of the

payee from solely that of "Century Inns, Inc." to "Century Inns, Inc. and Sage Construction Company, Inc." This change in fact was accomplished according to the evidence. The Court finds that this action taken by Gulf National, although not legally necessary at that time, was not only prudent and reasonable, but in fact was a step that actually protected Sage's interest. The fact that Sage may have stumbled or mishandled its business relationships with Century or its subs, certainly is no reason to point the finger of blame at someone else. On the basis of this evidence, the objectors argument is not only without merit, but factually supports the Bank's position.

The objectors then called Jack Tiblier of Tiblier Floor Covering, a contractor for ceramic tile, carpet and vinyl. Mr. Tiblier dealt directly with Century, and not through Sage. Mr. Tiblier testified that in mid February 1984, he went to see Tem Fowlkes in regard to other jobs. At that time, Mr. Tiblier said "I didn't approach him on money for Century Inns". However, in late February to early March, Mr. Tiblier said that he went back to see Fowlkes for Century money and Fowlkes assured him that he would be paid. In the coming and going in the building where Fowlkes' offices were located, Mr. Tiblier stated that he "saw Chris Wood on the elevator in the Hewes Building and asked him when he would be paid." Mr. Wood, the closing and disbursing attorney, for the construction loan here, occupied offices on the same floor of the same building as the Fowlkes enterprises. This time frame apparently occurred in the late February to early March dates that Mr. Tiblier referred to in going to see Mr. Fowlkes. Nothing was given to either the Gulf National Bank in writing nor to the closing attorney during this time period by Mr. Tiblier, and nothing occurred with Wood other than the question being asked by Tiblier on this point. Tiblier filed a stop notice, sending it to John Rosetti of the Gulf National Bank on May 17, 1984 and also filed a lien, some two months after these conversations on the elevator with Wood and the previous conversations with Fowlkes and substantially after the last construction loan draw. Nothing here provides any basis or gives any evidence which would support the Sage or other objectors claims.

The objectors then called Mr. Mark Seymour, a civil engineer, involved with Mr. Terrell Moran as a partner, to the stand. Mr. Seymour testified that, while their firm was still owed money, no stop notice or construction lien has ever been filed by him or Mr. Moran. That was the extent of his testimony, other than to explain how some of the retainage figures worked and to explain his knowledge of the Government Street Lumber claim.

Mr. Bert Lindsey, an electrical contractor with Foley's Electric, was the next witness called, and he was asked about his notice given to any appropriate party here. Mr. Lindsey testified that he talked with Louis Sage and Jim Sage about money not being paid to him on time. Sage Construction Company was located also in the Hewes Building in Gulfport, on a floor below the offices of Century Inns and the Fowlkes Enterprises. Mr. Lindsey testified that on one of the trips to the Sage offices, he saw Chris Wood on the elevator and asked him when they would be paid. Mr. Lindsey stated that "he did not ask Chris or demand anything from him." The only thing Lindsey said in response to Mr. Wood's comment was "Good, I need some money". He recites no contact with the Gulf National Bank in his testimony. The record is unclear as to whether this subcontractor ever filed a lien or stop notice, but it is apparently clear it was not done during this time period, if at all and that none of this testimony provides any support for the objectors' claims.

The claimants, in earlier testimony, did call Templeton Fowlkes to the stand, that testimony being made a part of this record by agreement. On cross-examination, Mr. Fowlkes was asked about the stop notices that had been filed. In response to the question, Mr. Fowlkes testified that no stop notices, other than perhaps Noble Steel, had been received until shortly prior to the

time near which the Chapter 11 filing was made. Also, in response to cross-examination questions concerning the statements made by representatives of his company under oath about the payment affidavits, Mr. Fowlkes stated "These affidavits were true and correct insofar as the draw dates were concerned, *pursuant to the terms and agreements reached between Sage and myself on amounts due Sage at that time.*" (emphasis supplied) Mr. Fowlkes stated that there had been various agreements reached between him and Jim Sage on amounts to be paid, and that "I was the only person at Century that made agreements with Sage and vice versa". Mr. Fowlkes also stated that in his relationship with Jim Sage that "Sage told me not to talk to the subs". It should be noted that Jim Sage disagreed at trial with Fowlkes' characterizations of any verbal side agreements between the two of them.

The objectors also called Chris Wood, the disbursing attorney to testify. In response to questions about his knowledge concerning the Sage payment irregularities, Mr. Wood testified that Phil Carriere, an officer at that time at the Gulf National Bank, was his contact for the construction loan, that he took his directions and instructions from Mr. Carriere, and later from Mr. Rosetti, after Carriere left the bank. Wood testified that the Gulf National Bank did not provide him with a copy of the construction loan agreement. Wood stated that he received written instructions, (all of which are in evidence) from the bank for the construction draws. However, in taking his instructions from Gulf National, Mr. Wood stated that Mr. Carriere advised him by telephone that from the third draw forward, the draw checks on the construction loan were to have Sage's name on them. That instruction was followed by Wood. As to Mr. Wood's knowledge about the inaccuracies claimed by Jim Sage on the affidavits from his personal knowledge, Mr. Wood stated in response to a question in the regard, "When someone swears to something, you assume they are telling the truth", referring to the Sage affidavits on the payments as described above. The

Court finds this to be a fair assumption and in fact was properly and reasonably relied upon by Wood.

Mr. Elwood Shoemaker of Confederate Building Supply was called by the objectors in an effort to show that a loan made by Gulf National Bank to Confederate Building Supply provided actual notice or should have put Gulf National on notice that Sage or Century payments were not being made to the subs. Again, the documents in evidence with the Court, and in regard to in the loan arrangement from Confederate to Gulf National indicate otherwise. In the initial testimony by Mr. Shoemaker, he testified that he called Chris Wood and Phil Guicet, an employee of Century. Mr. Shoemaker stated that he "called to ask and checked to see when money would be disbursed to Sage". He stated that he also talked with Louis and Jim Sage in mid February at different times about disbursements to Confederate Building Supply. It is clear, as a matter of fact, that Mr. Shoemaker gave no type of notice in his testimony with this conversation which put Gulf National or Wood, the closing attorney, on any type of notice, express or implied, which should, (under the nature of inquiry described above) have given the construction lender or the closing attorney cause for concern of a nature which would support the claims made in the law suits here. Mr. Shoemaker did testify that in mid February he met with Mr. Rosetti of the Gulf National Bank to talk about a loan, after Jim and Louis Sage told him to get Ken Hatcher to assist Confederate Building Supply with a loan for its cash flow needs. The loan application in evidence states, in the hand writing of Emile Daniel, the partner of Elwood Shoemaker, that the purpose of the loan was to pay payables due from building supplies used on Century Inns motel project in Biloxi, Mississippi, and states as follows: "Job completed 3/7/84 and Sage Construction Company, Inc. owes them $51,325.11 which will be paid at completion of project on or about 3/22/84". This application is dated March 8, 1984 and was for a thirty day period maturing on

April 8, 1984, the loan being for $25,065.70. Again, the Court finds that neither this loan application nor the testimony of Mr. Shoemaker gave actual or constructive notice to Gulf National of any problems that would suport the objections raised by the creditors in its objecting pleadings. Neither Mr. Shoemaker nor Mr. Daniel ever forwarded a stop work order to the job on behalf of Confederate Building Supply, according to the testimony. In fact, Mr. Shoemaker testified that he heard a conversation between Mr. Wood and Jim Sage, where Sage asked Wood about when construction disbursements w,ere to be paid and Wood stated "In the next few days or so". This conversation was in mid January or February, according to this witness (the Court noting that this conversation occurred during the construction loan process). Mr. Daniel, Mr. Shoemaker's partner, testified that "we felt like since Gulf National was the lender on the job, we might be able to *borrow some money against what was left in the job.*" (emphasis supplied). Mr. Daniel states that Confederate Building Supply had had payment problems with Sage on previous occasions prior to the Century Inns job, so this problem was not new to them.

The objecting creditor groups then called Mr. Louis B. Sage to the stand, who testified that, in addition to the matters previously indicated as his testimony, the draws to Sage from Century were not being made in accordance with their cash flow needs. He stated that he talked with Mr. Carriere at. Gulf National about the problems that he was personally experiencing with his company, but "I decided to continue with the job even though the draws were late or not being made." It should be noted that Sage Construction banked at Gulf National and Mr. Carriere was their loan officer, also. Louis Sage stated that "I also had numerous conversations with Tem Fowlkes in regard to the failures to get all of our money from Century, but we got the run around." Mr. Sage testified that Ken Hatcher, his then son-in-law, usually acted on behalf of the construction company in relations and contact with the bank up until

the time of his departure, and after that, a Mr. Busby handled these matters. On cross-examination, Mr. Sage was asked about his knowledge concerning the signing of the AIA forms which Jim Sage, his son, disclaimed any knowledge about the accuracy of these documents. Mr. Louis Sage testified that "normally, this form is to be used by the developer to show to the lender to allow the lender to affix a dollar value to the draw request." Even though Louis Sage possessed this type of information from his history in the construction business, and Sage Construction now claims the fault here to be not theirs, but that of the bank, either he, his son or his then son-in-law continued to execute or authorize execution of these sworn affidavits and statements during the construction draw period. Louis Sage was asked on cross-examination whether he ever reviewed the checks from Gulf National Bank to Chris Wood. The answer was negative. He was asked whether he ever looked at any of the closing statements signed by Hatcher, on behalf of Sage Construction indicating the distribution of proceeds. The answer was negative. Mr. Louis Sage was asked whether Hatcher was authorized to sign on behalf of the corporation and act on his behalf. The answer was in the affirmative. Louis Sage was asked that after Hatcher signed these checks payable to Century and Sage for draws #8, 9, 10 and 11 and gave the checks back to Fowlkes, "Did you ever tell Rosetti that you gave the money back to Fowlkes and he did not give you any money back?". The answer from Louis Sage: "No". The next question on cross-examination was "Did you ever tell the subs this?". Louis Sage's answer: "No". The last or eleventh draw was signed by Louis Sage's son, Jim Sage, indicating all of these payments had been made to subcontractors and to the Sage Construction Company. On the stand in response to questions on cross-examination Louis Sage was candid in reflection on these events. In this regard, he stated "I now wonder why we were doing these stupid things that we were

doing. I realize we could have shut the job down. If I had known that Hatcher's signature was on the closing statements or draw request, which I have never seen except for today, I would have formed a different opinion." The cross-examination's next question was: "What was that?". Louis Sage's answer: "I would have shut the job down." In response to a question on cross-examination about the use of the AIA form for payment and completion purposes in regard to its connection with a fixed price contract or cost plus contract, Louis Sage stated "The same general AIA form could be used on either job with a few minor changes." Louis Sage did state that Ken Hatcher handled all the day to day operations, including preparation of these AIA documents, the draw request, the collection and deposit of money and attending all of the closings. Clearly, as a matter of fact, Ken Hatcher would have been a key witness at this proceeding. He did not attend or testify to either support or contradict any of the claims made in this case.

Clearly, the individuals running Sage Construction were either not paying attention to their own business operations or not coordinating with each other, or both. These problems appear to have been a major catalyst for the snarl we have here, none of the causes of which can be attributable to any actions, non-actions or knowledge of Gulf National.

Reviewing Sage's evidence, the Court finds that there were clear aberrations in the management of the Sage business operations from the testimony above, since Mr. Hatcher handled the day to day operations, and quite obviously at this stage of the proceeding, had the most knowledge of the facts of the case, but he did not appear or testify. Louis Sage testified that he owned all of the stock of the company, but did not really know what was going on according to the above testimony, other than believing the company was not receiving enough cash flow to service the business operations. Jim Sage testified that as one of the officers of the business, he really had no knowledge of what was going on concern-

ing the cash being dispersed from Gulf National through the construction loan process and in fact was off of the job approximately one month. Mr. Phil Guichet testified that he and Jim Sage were good friends, and to his knowledge, Jim Sage was in the hospital for "drinking" during this period. Tem Fowlkes testified that Jim Sage went into the hospital in February or March of 1984 and was in and out for about a month at this time with these problems described by Guichet. Jim Sage testified that he did check into the hospital for a period of time during the time frame described by Fowlkes for some problem such as this, and Louis Sage testified that he did not know what the problem was that his son went into the hospital for. In any regard, this series of events indicates that during this critical period, Mr. Hatcher having left in March, there was a real lack of business cohesion from Sage's part, problems which may have been influenced by Fowlkes' entrepreneurial aggressiveness, but clearly, not problems that Gulf National either expressly or impliedly was aware of, or caused, or had any reason to know through its own officers, or the closing attorney, Wood. Whether through lack of knowledge, lack of paying attention or whatever, Sage Construction Company personnel were simply not paying attention to business, nor operating their business in a prudent manner, these matters being clear by the reflective and candid admissions of Mr. Louis Sage, by the garbled and contradictory testimony of Jim Sage, and by the simple failure of these individuals to know what Mr. Hatcher was doing or to take steps that they knew or should have known as prudent businessmen needed to be done in order to learn about their own internal business operations. The testimony of fact witness other than Sage personnel called by the objecting creditors simply provides no factual basis to support their legal claims and arguments and therefore is accorded no weight at all.

In calling its witnesses, Gulf National Bank called Mr. Phil Carriere, a former vice president of the bank, now with anoth-

er bank in the area. Mr. Carriere had been employed with Gulf National for eleven or twelve years at the time of the Century loan. He testified that he was familiar with the construction financing provided by Gulf National Bank and at the time of the issuance of that committment, he was aware that Pine Belt Savings and Loan Association, a local lender, had issued a permanent loan commitment. Century having that permanent loan committment was apparently a requirement of the construction loan. Mr. Carriere stated that in the dealings with Sage, who was also a customer of the bank, he dealt with Mr. Ken Hatcher "who was the administrative arm of Sage". Mr. Carriere confirmed in his testimony the draw and disbursement procedure described above and also confirmed that Gulf National maintained control of the loan itself, not through its disbursing agent and attorney Wood. This was done by virtue of maintaining the construction loan agreement and its interpretation in-house and sending instruction letters to Wood for his disbursement procedures. Mr. Carriere testified that, "The amount of the draw approved and paid by Gulf National Bank would be the amount requested on the AIA form by the borrower", this being Century Inns. He was asked "Were there any problems that you became involved with in this loan during the time you were on the loan?". Mr. Carriere responded that "At one time Ken Hatcher said that he had not gotten one check at draw time, that they (meaning Century Inns and Sage) were swapping checks and at closing he did not get one. I asked Hatcher if he understood the purpose of the affidavit and the signing of it. Hatcher said he would not sign any affidavits if he was not getting paid." Mr. Carriere further testified that after that conversation, he was never contacted further by Hatcher on this issue. He further testified that "I was never contacted by any subcontractors to say they were not getting paid." Bank counsel asked Mr. Carriere, "Did you ever tell Mr. Hatcher that he would get paid later if he was not getting paid?" Mr. Carriere replied "No". In response to a question concerning his knowledge of the construction loan disbursement procedure during this time, Mr. Carriere replied: "As a general rule, the bank required the AIA forms and cover letters to substantiate the draw request with an engineer report and certificates and affidavits." The bank counsel then asked Mr. Carriere, as the officer on this loan what would have satisfied him that the terms of the construction loan, were being met. In response, Mr. Carriere stated, "I would have been satisfied that the terms of the agreement had been met if the requests had been accomplished by AIA forms signed by the contractor with an engineers certificate and receipt of the title certificate plus the affidavit." The evidence and facts indicated that all of these requirements, in fact, had been done during the course of the proceeding of the construction loan and disbursements. Mr. Carriere stated that the bank knew of the existence of the affidavits kept by Mr. Wood. Mr. Carriere stated that he felt comfortable with the affidavits being signed and handled by the closing attorney since that attorney was getting the title binders. At one point in his testimony, Mr. Carriere also stated that "With the exception of the incident involving Ken Hatcher's complaint, he was made aware of no other specific claims that Fowlkes was not paying Sage during his tenure with the bank."

Mr. Carriere was suceeded by Mr. John Rosetti on this account at Gulf National after Mr. Carriere's departure, and in his testimony Mr. Rosetti, who was called by the creditors, stated that May 1, 1984, was "the first date when I thought there was any problem with the Century loan". He stated that when he was taking over the loan portfolio from Mr. Carriere "I was briefed on the Hatcher incident", this being in late January. This was the extent of his knowledge insofar as any problems according to his testimony.

The Court finds that Gulf National, as a matter of fact, took all reasonable precautions and exercised all reasonable and due diligence as the lender under the terms of

the construction loan agreement to ascertain that the funds being disbursed through the construction loan agreement were in fact, going into the job. This fact finding is based on the testimony of the witnesses, taken as a whole, as well as the documents in evidence, including affidavits signed by the contractor and the developer (Century), the AIA documents which were certified to by the engineer, who was hired by agreement in the construction loan agreement to certify that the items for which money was being expended were "in place". The Court further finds (1) that the bank maintained complete and absolute control of the loan disbursement procedure, (2) that it was followed in accordance with the loan agreement, (3) that Chris Wood, the closing attorney and disbursing agent on the loan, not only followed the specific instructions of the lender, Gulf National, but closed the construction loan in a reasonable and proper manner and was provided with no actual or constructive notice through the testimony shown above of any failures of the subs or Sage to be properly and appropriately paid. In fact, the Court finds affirmatively that Wood had a right, as a matter of fact and law, to rely upon the affidavits signed by Sage. The testimony of Jim Sage is at best contradictory and bears no weight or credibility under the circumstances. The testimony of Louis Sage is instructive as a matter of fact, as to the real problems involved in this case which the Court has made specific findings on above.

## CONCLUSIONS OF LAW

This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(B). Thus, this Court may make the final determination of the issues raised herein.

■ The filing of a proof of claim in accordance with the procedure established by the Bankruptcy Code and the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of that claim. Bankruptcy Rule 3001(f). Where an objection is filed to the proof of claim, the objecting party has the initial burden of going

forward with sufficient evidence to rebut the prima facie validity of the claim. *In re Windsor Communication Group, Inc.,* 45 B.R. 770 (Bankr.E.D.Pa.1985), *In re Missionary Baptist Foundation of America, Inc.* 712 F.2d 206, 212 (5th Cir.1983). Only after the objecting party meets his burden does the burden of proof shift to the claimant filing the proof of claim. This proof allocation provides a proper balancing of burdens, assuring that the objecting party does not underprove its objections, while, at the same time, assuring that the claimant filing the proof of claim need not overprove his claim at the mere cry of inequity by the objecting party. *Matter of Multiponics, Inc.,* 622 F.2d 709, 714 (5th Cir. 1980).

■ In matters where objecting creditors demand equitable subordination of a filed proof of claim, the Bankruptcy Court is armed with both statutory (§ 510) and equitable authority to exercise the power of equitable subordination of a claim. Related to this statutory section also for consideration by the Court at the appropriate juncture is § 502 of the Code regarding allowance of claims or interests and § 506 of the Code relating to determination of secured status of claimants.

■ Bankruptcy Courts are traditionally considered as being Courts of equity, *Matter of Mobile Steel Company,* 563 F.2d 692 (5th Cir., 1977); *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and it is settled that they possess the power "to prevent the consummation of a course of conduct by [a] claimant which ... would be fraudulent or otherwise inequitable" by subordinating his claim to the ethically superior claims asserted by other creditors, *Matter of Mobile Steel Company,* Id. The *Mobile Steel* case is controlling insofar as the legal principles applied in this action. In discussing the limitations of the application of equitable subordination, *Mobile Steel* confronts two principal bounds. First, equitable considerations can justify only the subordination of claims, not their disallowance. "A claim that for reasons of equity must be postponed should be al-

lowed, and the postponed incorporated into the order of allowances as a qualification thereto." *Id* 563 F.2d at 699.

More importantly, the Fifth Circuit test for equitable subordination, through *Mobile Steel*, requires that three conditions must be satisfied before the exercise of the power of equitable subordination is appropriate, these being:

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. (Note: now the Bankruptcy Code).

The Fifth Circuit, in the case above, stated that, in determining whether these three conditions are satisfied, three principles must be kept in mind.

The first is that inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition of assertion of the claim....

The second principle is that a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct ...

The third guiding principle relates to the allocation of the burden of proof.

This third principle as stated, relates to the burden of proof, and this Court has adopted the burden of proof, as described above.

The law affecting resolution of the substantive issues, when these tests are applied, in the absence of overruling federal law, is to be determined by reference to state law. *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 642 F.2d 744 (5th Cir., 1981), *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946).

In this Court's determining whether reasonable diligence was utilized by a construction lender to determine whether funds of that loan disbursed by the construction lenders actually went into the construction of the project, and whether the construction lender had used reasonable diligence to assure that the funds disbursed were actually going into the construction, the case of *Peoples Bank and Trust Company and Bank of Mississippi v. L and T Developers, Inc., et al,* 434 So.2d 699, (Miss., 1983) is not only instructive, but also controlling, on such a question. In this jurisdiction where a creditor in bankruptcy claims that the doctrine of equitable subordination should be applied, based on a claim that none of the funds disbursed by a construction lender actually went into the construction of the job in question, and that the construction lender did not use reasonable diligence to assure that the funds disbursed were actually going into the construction of the job, then, a combination of the equitable subordination provisions of § 510(c) of the Bankruptcy Code, the Bankruptcy Rules, the *Mobile Steel* equitable subordination standards and the *Peoples Bank and Trust* case standards are applicable in reaching conclusions of law affecting a filed, but objected to proof of claim, challenged on the basis that the facts require application of the doctrine of equitable subordination.

In the instant action, Gulf National Bank filed its proof of claim, pursuant to § 502(a) and § 506 of the Bankruptcy Code, claiming a secured status, which rose to the level of priming all other claims. That claim, of course, was allowed until such time that a party in interest objected. As shown in the Findings of Fact above, objections were filed by Sage, the Unsecured Creditors Committee and Government Street Lumber, all of whom adopted a common position in the challenge to Gulf National. These objecting parties, therefore, under the applicable law above, were charged with the burden of proof and going forward. If the facts were proved, the burden would then shift to Gulf National

and require the Bank, not only to prove the good faith of the transaction, but also to show its inherent fairness.

The law is clear that as to conduct of the parties in matters such as these, special scrutiny must be given to the dealings of the Bank with the debtor, and the Court has done so here. The Bankruptcy Court has the equitable power and the duty "to shift the circumstances surrounding any claim to see that injustice or infairness is not done in the administration of the bankrupt estate." *Matter of Multiponics, Inc.,* Id at 714. *Pepper v. Litton,* 308 U.S. at 308, 60 S.Ct. at 246, 84 L.Ed. at 290.

■ In order for the objecting creditors to sustain their burden, they must prove that Gulf National violated the rules enunciated in the *Mobile Steel* test above, that is, (1) Gulf National must have engaged in some type of inequitable conduct; (2) the misconduct of Gulf National, if any, must have resulted in injury to the creditors here or conferred an unfair advantage on Gulf National; and (3) equitable subordination of Gulf National's claim must not be inconsistent with the provisions of the Bankruptcy Code.

■ Further, for the Court to apply the test and law on the facts presented by the objecting creditors, the Court must keep three principles in mind in determining these three conditions. The first, of course, is that inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of the claim irrespective of whether it was related to the acquisition or assertion of the claim. In this context, the Court must determine that the inequity which would entitle the Bankruptcy Court to regulate the distribution to Gulf National, by subordination or other equitable means, need not therefore be specifically related to Gulf National's claim, either in its origin or in its acquisition, but it may equally rise out of any unfair act on the part of Gulf National, which affects the bankruptcy results to other creditors and so makes it unequitable that Gulf National should assert a parity with them in the distribution of the estate.

*Mobile Steel Company,* Id. at 700. Secondly, the Court must subordinate Gulf National's claim only to the extent necessary to offset the harm which the debtor and the creditors, other than Gulf National, may have suffered on account of the claimed inequitable conduct of Gulf National. Thirdly, the Court is required to be guided by the burden of proof rule as described above.

■ In their objections, the creditor groups attacking the Gulf National proof of claim, argued that the Bank failed to follow the requirements of the *Peoples Bank* case, and therefore should be equitably subordinated, pursuant to the *Mobile Steel* test. In reviewing the facts of the case, the Court here then must ascertain whether these tests were met. In *Peoples Bank, none of the funds* (emphasis supplied) disbursed by the construction lender actually went into the construction, and this finding of fact by the chancellor at the trial level was upheld by the Mississippi Supreme Court. In analyzing this fact situation, the Court there held that "the construction lender's lien should not be extended any further than its equities require and therefore should not be given priority except to the extent that the money secured thereby was actually used in paying for the construction of the building." Further, the Court stated that "it is simple justice that such mortgagee (construction lender) shall have preference only to the extent that its funds actually went into the construction." The second test, which must also be applied in conjunction with this first test, (the test being *"and"*, not *"or"*), is whether Gulf National used *reasonable diligence* to assure that the funds disbursed were actually going into the construction of the motel project. (emphasis supplied).

In reaching its conclusions, the Court here would take these test in reverse order for application of the law to the applicable Findings of Fact above.

The instant case is clearly distinguishable from *Peoples Bank,* where no construction money went into the job, inas-

much as there is no argument that a substantial amount of funds disbursed by the construction lender actually went into the construction of the job here. The record here reflects a stipulation by the objecting parties and Gulf National that $1,100,-000.00 (in round figures) went into the job, and the only argument is over whether the remaining construction loan funds can be shown and be proven as having gone into the job. The latter argument, is of course, under the law, the burden of the objecting creditors to prove. The Court then must ascertain whether Gulf National used reasonable diligence to assure that the funds disbursed were actually going into construction.

Under the above facts, it is clear that the Gulf National Bank, by written agreement, through the construction loan agreement, created procedures which provided the oversight factor to enable this construction lender to determine the funds disbursed were actually going into the job. Specifically, the agreement required not only the owner/borrower (the debtor) to make such affidavits and statements, it also required a separate party, being Mr. Moran, the professional engineer, to certify that the materials, etcetera, were *"in place"* at the time of the forwarding of the request for each construction draw. In addition, the testimony indicated that there were some inspections, and the closing attorney, who had to pass the construction job to go to the Courthouse to check the title, testified that he saw the construction progressing as he went to and from the Courthouse. The certifications of the professional engineer, Moran, and the reliance by Gulf National on this third party to render certifications on completion, work progress, etcetera, are some of the strongest tools that a construction lender can use in its exercise of reasonable diligence to assure funds or actually going into the job. Additional considerations here were the statements of the general contractor, Sage, that they had been paid, the statements of Century Inns, to the same affect, as well as those of Moran.

All of these factors taken with the failure of the objecting creditors to show or prove that any statutory notice or actual notice of a degree sufficient to put either Gulf National or its closing attorney on notice that the funds disbursed in the construction loan were actually not going into the construction require this Court to reach the conclusion that Gulf National, in fact, and as a matter of law met, the test of the *Peoples Bank* case, i.e., (a) a significant amount of the funds disbursed by the construction lenders, by agreement, have been shown to have actually gone into the construction and (b) the construction lender used reasonable diligence to assure that all of the funds disbursed were actually going into the construction of the motel by the methods described above. On these fact findings and conclusions of law, the claims of the objecting creditors must fail. The findings and conclusions being the lynch pin of the objecting creditors arguments, the Court must consider whether any of the requirements, separately or together, of the *Mobile Steel* test have been met which may require equitable subordination by means other than those argued under the *Peoples Bank* case.

The Court finds that the Bank engaged in a straight forward construction loan transaction and was not placed on any form of notice, either actual or implied, which required it to take steps to protect the interest of Sage or any subcontractors claiming the right to equitable subordination. None of the facts described above give rise to any implications that Gulf National or any of its officers or any closing attorney engaged in any conduct which would meet the first test of *Mobile Steel*, i.e. that the claimant must have engaged in some type of inequitable conduct. It is concluded that this test is not met and must be discarded. Further, there being no misconduct, the second test is not met, i.e. the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the Bank. Here, there was no misconduct on the facts described above and no unfair advantage given to Gulf National, the con-

struction lender, who was entitled to claim its advances under the security. Further, the third test has not been met, that is, that equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. There being no meeting of the first two tests, equitable subordination is not allowable under the instant situation, and therefore, the third test should be disregarded. In determining whether these three conditions were satisfied, the Court applied the three principles required above, and the Court concludes that not only are these three conditions not satisfied to meet the *Mobile Steel* test, but that the three principles described above are likewise inapplicable.

▮ In the third principle, concerning the burden of proof, the objecting creditors, having never met the burden of proof required under the legal principles described above, the Court holds that the burden of proof never shifted from the objecting creditors to Gulf National, because sufficient evidence was never presented by the objecting creditors on the issue of unfairness or inequitable actions by the Bank to warrant favorable consideration of subordination. The Court here is mindful of the *Multiponics* requirement that proof allocation provides a proper balance of burdens, assuring that the objecting creditors do not underprove their objections, while, at the same time, assuring that the Bank need not overprove its good faith and fairness at the mere cry of inequity by the objecting creditors. *Matter of Multiponics, Inc.* Id. at 714.

The cry of inequity clearly was present in this action, but in presenting its case, the Bank met its requirements, as described above, and the objecting creditors failed on the burden of proof. For the reasons cited in the Findings of Fact and Conclusions of Law, the objections of the creditors, Sage, Unsecured Creditors Committee and Government Street Lumber, must fail as a matter of fact and law, and these objections are overruled and denied. The proof of claim by Gulf National Bank will be allowed for its full amount of principal plus accrued interest. The question of attorneys fees claimed by Gulf National in its proof of claim, will be held in abeyance, to be decided at a later evidentiary hearing.

The Court is of the further opinion that the amounts cited as "retainage" in the amount of $220,274.55, are in fact disbursed construction loan funds, being held in escrow under the terms of the contracts and agreements for the benefit of the estate, these amounts being held until the conclusion of the job and to then be paid. The job has now been concluded and finished, and these funds should be paid to the rightful party. In this situation, the rightful party will be the estate of Century Inns, Inc. The funds are to be paid into the registry of the Court in an interest bearing account and to be disbursed only after notice and a hearing and a order of the Court.

The Government Street Lumber claim is clearly, both as a matter of fact and as a matter of law, that of a subcontractor to Sage Lumber and would be subordinate to the claim of Sage. Government Street had a contractual relationship for the sale of supplies to Sage during the construction job, and there was no privity between Century and Government Street, as a matter of evidence. Sage being in Chapter 11 proceedings, the claim of Government Street Lumber is properly filed in that Chapter 11 proceeding and should be allowable for the full amount, per the evidence presented in this proceeding, in that latter action.

It is ORDERED AND ADJUDGED that the claim of Gulf National Bank for the full amount of its principal and accrued interest to date is hereby allowed, and the objections of the creditors, Sage, Government Street Lumber and the Unsecured Creditors Committee in this proceeding are not well taken and are denied and overruled for reasons foresaid.

EXHIBIT A

CENTURY INNS, INC.
2505 Fourteenth Street
Second Floor
Gulfport, MS 39501
(601) 863-7218

September 1, 1983

Louis B. Sage, President
Sage Construction Company, Inc.
Hewes Building
Gulfport, Mississippi 39501

Dear Mr. Sage:

RE; CENTURY INN (QUALITY) MO-
TEL, BILOXI, MISSISSIPPI

I am enclosing an executed original and one copy of the "cost plus" contract on the Century Inn (Quality) 100-room motel project to be located in Biloxi at U.S. Highway 90 and Briarfield Avenue.

This contract is in addition to that one executed at a fixed price.

This contract supercedes the terms and conditions of the fixed price contract with two notable exceptions:

1) All draws shall be based on the terms and conditions of the fixed rate contract and the estimated cost of goods and materials in place and the estimated bar graph schedule of completion time. Any overruns plus profits will be paid 20 days after final completion.

2) A procedure for draws will be that followed under the fixed rate contract including the 10% retainage as followed in the past with the Westwick, Sentury and Shadows on the Gulf projects.

In no way should Century Inns, Inc. or any of its principals or affiliates be considered a contractor or an employer other than the way those terms would be used as a developer.

Please signify your acceptance of this understanding by signing below and consenting that this understanding be attached to the "cost plus" contract as a part thereof.

ACCEPTED;

/s/ James L. Sage V.P.

SAGE CONSTRUCTION CO., INC.
By:

Very truly yours,
/s/ Steven R. Avery
STEVEN R. AVERY
President