INTERLINK INTERNATIONAL FINANCIAL SERVICES, INC., d/b/a Epaylink, Plaintiff,

v.

Michael BLOCK, Defendant.

No. 01 CIV. 3500(CSH).

United States District Court, S.D. New York.

May 15, 2001.

Swidler, Berlin, Shereff & Friedman, LLP (Shari L. Steinberg, of counsel), New York City, for Plaintiff.

Gerald P. Gross, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

In this action based upon a criminal statute prohibiting "fraud and related activity in connection with computers," 18 U.S.C. § 1030, as to which § 1030(g) creates a private right of action, defendant moves the Court for an increase in the amount of the security previously given by plaintiff pursuant to Rule 65(c), Fed.R.Civ. P., to obtain a temporary restraining order ("TRO").

The exigencies of time preclude a detailed statement of the facts. For present purposes it is sufficient to say that on April 26, 2001, the Court on plaintiff's application signed an *ex parte* Order to Show Cause containing a TRO and required plaintiff to furnish security in the amount of $5,000. At a hearing on April 30, 2001, at which both parties were represented by counsel, the Court directed that the amount of security posted by plaintiff be increased to $100,000. Plaintiff, ostensibly encountering some financial difficulty in complying, had not yet furnished security in that amount when defendant brought on the present motion for an order directing plaintiff to furnish security in an amount greater than $100,000. The Court conducted an evidentiary hearing on May 7, 8 and 9, 2001, and heard oral arguments of counsel on May 9 and May 10. This Memorandum Opinion decides defendant's motion.

### I.

Rule 65(c) provides in pertinent part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

■ "The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." 13 *Moore's Federal Practice* (3d. ed.1997) (hereinafter *Moore* ) at 65–94.1. "The sum posted in a bond is determinative of the limit that may be recovered by a wrongfully restrained party; in the absence of proof that the movant sought to enjoin with malicious intent and without probable cause, recovery by a party later found to have been wrongfully enjoined will be limited to that amount." *Id.* at 65–94. "The risk created by the rule limiting recovery to the amount of the bond is that an enjoined party may be unable to obtain adequate redress." *Little Tor Auto Center v. Exxon Company USA,* 822 F.Supp. 141, 144 (S.D.N.Y.1993).

■ The provision in Rule 65(c) that security shall be given "in such sum as the court deems proper" indicates that "the district court is vested with wide discretion in the matter of security," *Ferguson v.*

*Tabah,* 288 F.2d 665, 675 (2d Cir.1961). A district court may dispense with the posting of security entirely where parties sought to be enjoined or restrained "have not shown that they will likely suffer harm absent the posting of a bond," *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996); *Ferguson,* 288 F.2d at 675 ("it has been held proper for the court to require no bond where there has been no proof of likelihood of harm"); *see also International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir.1974) ("the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined."); 11A Charles A. Wright–Arthur R. Miller–Mary Kay Kane, *Federal Practice and Procedure* (2d ed.1995) (hereinafter *Wright*) at 293 ("the court may dispense with security altogether if he grant of an injunction carries no risk of monetary loss to the defendant.").

■ The district court need not order security in respect of asserted economic damages that are "speculative at best," *Inflight Newspapers, Inc. v. Magazines In–Flight, LLC,* 990 F.Supp. 119, 140 (E.D.N.Y.1997); *see also CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.,* 893 F.Supp. 508, 525 (D.Md.1995) ("Claims based upon speculation or conjecture, including claims for a business contemplated but not yet established, will not support an award of damages on the [Rule 65(c)] bond."), *aff'd.,* 92 F.3d 1203 (4th Cir.1996) (table).

Security furnished under Rule 65(c) will not include any damages "for claims against the party who instituted the action other than those directly attributable to the improvidently issued injunction." 11A *Wright* at 292; *CVI/Beta,* 893 F.Supp. at 525 ("Moreover, damages claimed under an injunction bond must arise from the operation of the injunction itself, not from damages caused by the suit independently of the injunction.").

## II.

■ Applying these principles to the case at bar, defendant Block has shown neither a likelihood nor a risk of economic harm resulting from his compliance with the restraints imposed by the first decretal paragraph of the TRO. The purpose of those restraints is to prevent Block from interfering with or meddling in Interlink's business operations and Interlink's relations with its clients. Block's professed concern that these restraints preclude him from trying to market the software program he developed to potential users is based upon a fanciful and overbroad reading of the TRO's language.

Alternatively, Block has made no effort, and has laid no preparatory plans, to engage in such marketing. Block testified at the hearing that his business objective for the foreseeable future is to continue working full time for the Sporn Group, Inc.; and there is no suggestion in the record that the Sporn Group is interested in Block's software program. Accordingly the damages that Block claims these restraints might cause are entirely speculative and conjectural.

## III.

That leads to consideration of the mandatory provisions contained in the second decretal paragraph of the TRO, which form the core of Block's concerns as expressed during the hearing. Specifically, Block is afraid that if he complies with those provisions, plaintiff Interlink will gain unfettered and total access to the software program Block developed, and then misappropriate (or convert, an equally descriptive verb from the common law of torts) the program to Interlink's own

use, leaving Block uncompensated for his intellectual property.

While that concern lies at the heart of the matter, Block also claims that his compliance with the first of three enumerated categories of mandated conduct would be so time consuming that he might lose his present employment as a computer consultant to the Sporn Group and to a client of Sporn.[1] Block seeks to shore up that calamitous possibility by submitting a letter dated May 2, 2001 from David Sporn, the president of the Sporn Group, to Block's counsel, in which Sporn states that "there is a hiring freeze at the client, and any extended time away from the workplace would be viewed negatively and could actually result in termination." It is perhaps not unduly cynical to suppose that counsel was the inspiration for that letter; in any event, Block uses it as the basis for a demand that the TRO security include an amount representing 120 days of lost wages following an assumed termination of his present employment.

■ That assumed item of damages can only be described as speculative and conjectural. Apart from Sporn's letter, with its obvious tactical purpose, there is no evidence in the record that Block's continued and limited attention to plaintiff's business would likely result in the termination of his present employment. Indeed, the evidence points the other way. Block has been a Sporn consultant since late October, 2000; he testified that during the period between then and mid-April, 2001,

he would spend up to 20 hours a week on Interlink business; and there is no evidence of dissatisfaction on the part of the Sporn Group or its client with respect to Block's availability until David Sporn's carefully phrased May 2 letter, clearly written in contemplation of the Rule 65(c) hearing. Block is not entitled to security against the spectre of a TRO-caused future loss of employment.[2]

At least as fanciful and farfetched is Block's contention that he is entitled to Rule 65(c) security in respect of claims that might arise if the disclosures required by the TRO transform him into a Lanham Act plaintiff.

## IV.

■ The damage claim of substance arises out of the apparently undisputed fact that Block's compliance with the second decretal paragraph of the TRO, which requires Block to inform Interlink of the software program's "User Codes and Server Information" and to turn over to Interlink "all computer files and software," would give Interlink complete knowledge of and access to all facets and aspects of the software program that Block developed as a consultant to Interlink during the period between January 1999 and the end of October 2000 (when Block, having been paid nothing by Interlink, became a computer consultant to the Sporn Group). Such knowledge and access on the part of Interlink, Block argues, would amount to, or at the least could lead to, a wrongful

---

1. The record identifies that Sporn client as the Bank of America.

2. Block also contends that the expedited discovery depositions provided for by other paragraphs in the April 26, 2001 Order to Show Cause might take so much of his time that it could imperil his present employment. The short answer to that contention is that the expenditure of time Block must devote to

litigating the case does not arise from the injunction itself, but rather from the suit independent of the injunction, and consequently falls outside the ambit of Rule 65(c) security. The Order to Show Cause contains injunctive provisions—they are discussed in text—and scheduling provisions for the governing of the litigation. Block's argument ignores the distinction.

misappropriation of his intellectual property.

■ In postulating such a claim, Block is not engaging in mere speculation or conjecture. Depending upon the particular facts, such a claim may be viable in law. In *Cole v. Control Data Corp.*, 947 F.2d 313 (8th Cir.1991), the Eighth Circuit upheld a jury verdict in favor of the plaintiff computer programmer against his former employer for the employer's breach of a contract to market a software program the plaintiff developed during his employment with defendant, *and* for defendant's wrongful conversion of the program itself. "The jury returned a verdict against Control Data on the breach of contract claim for $150,000 in actual damages, and on the conversion claim for $2,000,000 in actual damages," 947 F.2d at 315, both awards being affirmed on appeal.[3]

*Cole* is instructive in the case at bar because it shows that a company employee (or independent consultant to a company) can, during the course of his employment (or consultancy), develop a computer software program which becomes his intellectual property and is vulnerable to misappropriation or conversion by the company. Moreover, *Cole* also instructs that a plaintiff so situated is entitled to recover separately on claims of breach of contract and conversion. The Eighth Circuit rejected Control Data's contention that "the damages for breach of contract and conversion are duplicitous, allowing Cole double damages for a single injury on alternative theories of liability." 947 F.2d at 320. The court of appeals reasoned that "Cole sought separate damages for the breach of contract, namely, the loss of profits for Control Data's failure to market the software program, and separate damages for conversion, namely, the value of the soft-

ware program itself." *Id.* at 321. This analysis demonstrates the error in the contention of plaintiff at bar that Block's only legally viable claim against Interlink is one for breach of contract. The facts could also give rise to a claim for wrongful misappropriation of Block's software.

Accordingly the questions on this motion become whether this potential harm entitles Block to security under Rule 65(c), and if so, in what amount. Plaintiff makes three arguments why the security should not be increased beyond the present $5,000 amount.

First, plaintiff's counsel contend that because Block's software program has been in plaintiff's computer system for some time, any appropriation (or misappropriation) occurred in the past, and thus cannot be said to have been caused by the TRO. In almost the same breath, counsel contend that plaintiff has no intention of appropriating Block's program in the future.

The first of these two facially inconsistent contentions requires no extended discussion. It borders on the frivolous to suggest that Interlink successfully completed an appropriation of Block's before seeking a TRO on April 26, 2001. Block, dissatisfied with his unpaid status, embedded a password in the program for the precise purpose of preventing total access by Interlink. Plaintiff seeks the TRO's mandated disclosures for the precise purpose of obtaining that access. It would distort reality to say that a thief has stolen a bicycle when the bicycle remains fastened to a lamppost with a lock and chain the owner uses to prevent a theft. Plaintiff's concept of program misappropriation as a legal *fait accompli* is equally unrealistic.

---

**3.** The court of appeals remanded the case to the district court for further consideration of the jury's award of $500,000 in punitive damages.

Plaintiff's second contention is that it has no intention of using Block's program, so that Block does not need security for the payment of damages caused by a misappropriation. Plaintiff bases that contention upon the testimony of (1) Yeruchem Levovitz, Interlink's president, that he is dissatisfied with Block's program and has hired another computer programming company, RK Software, to develop a different one; and (2) Suman Jha, RK's senior programmer assigned to the Interlink job, that RK has begun developing that new program and does not need the Block program's source codes to complete it. Levovitz and Jha say that they need the Block program's super user password, source codes, and database design only for the limited purpose of clearing up confusion in Interlink clients' accounts generated by past transactions. It is no exaggeration to say that Block views these disclaimers of a broader interest in his program with deep suspicion and distrust.

■ Obviously, at this beginning stage of the litigation it cannot be said with certainty that Block's compliance with the TRO would result in a misappropriation of his program by Interlink. But Rule 65(c) does not require the certainty of harm. The Rule mandates security for such damages as "may" (not "will") be suffered by a party subsequently found to have been wrongfully enjoined; the draftsmen's choice of verbs reflects an unavoidable uncertainty. 11A *Wright* at 292 says that Rule 65(c) security will usually be fixed in an amount that covers the "potential" costs and losses the enjoined party will suffer as the result of being enjoined or restrained, and at 293 speaks in terms of the "risk of monetary loss to the defendant." 13 *Moore* does not discuss directly the requisite potential or probability of harm, but cautions at 65-93 that "[i]n setting the amount of security for a preliminary injunction, the trial court should err on the high side," since "an error on the low side may produce irreparable injury, because damages for an erroneous preliminary injunction may not exceed the amount of the bond." The Second Circuit cases cited and quoted *supra* refer to the "likelihood" of harm.

In the case at bar, while the proposition falls well short of certainty, I think Block has shown a sufficient risk or likelihood of misappropriation of protected parts of his software program by Interlink to entitle him to Rule 65(c) security. I cannot accept at face value Levovitz's self-serving expressions of dissatisfaction with and disinterest in Block's program; Levovitz is an intensely interested witness whose present purpose is to avoid having to post security in any significant amount. Jha is not directly interested in the issue, but Interlink is a client of Jha's employer, RK Softwares, and Jha was presumably made aware of what testimony would advance Interlink's purposes. Levovitz's professions of dissatisfaction with the performance of the Block program ring somewhat hollow, given his testimony that with the program in operation Levovitz was growing the business and signing up new clients, at least until operating difficulties arose in mid-April, after Block had entered into his consultancy retention by the Sporn Group. Block testified that his program worked well, automatically keeping track of the transactions of the customers of Interlink's clients, and that the most severe problems arose from the inputting incompetence of an employee of Interlink's principal client, U.S. Healthcard, thereby fulfilling the Scripture of computing: "garbage in, garbage out." While Block is an equally interested witness, on the basis of the limited record before me I regard this as the more plausible explanation for the most recent problems affecting the U.S. Healthcard account.

Moreover, the record makes it crystal clear that if Interlink and its present consultant, RK Software, gain total and unfettered access to Block's program, the risk exists for the misappropriation (or conversion) of that program.

I further conclude, on the present record, that it is somewhat more likely than not that in such circumstances, a misappropriation of Block's program or protected parts of it would in fact occur.

I do not wish to be misunderstood. The record would not justify, and I do not make, a prediction with any degree of certainty that such a misappropriation will take place. However, as noted, the district court must decide whether or not to direct the giving of Rule 65(c) security at the very beginning of the case, when the certainty of future harm is not and cannot be required. For the reasons previously stated, I think that Block is entitled to security with respect to the risk of misappropriation of the computer software program he developed.

## V.

The remaining question is the amount of that security, which should bear some relationship to the value of the program. A computer software program may be valued by several recognized methods. Frequently the issue arises in a taxation context. "[T]he three major approaches to valuation have been used to ascertain the value of computer software: the fair market approach, the income approach, and the cost approach. Generally, the type of method employed will depend on the software being valued." Reinhard, *Tangible or Intangible—Is That the Question? Conflict in the Texas Tax Classification System of Computer Software*, 29 St. Mary's L.J. 871, 907–08 (1998) (footnotes omitted).

The Tax Court considered these three valuation methods in *Provitola v. Commissioner,* 1990 WL 141930 (U.S.Tax Ct. October 2, 1990), where the issue was the value for charitable contribution purposes of a software program its developer had donated to his alma mater, Stetson University. The Tax Court stressed "the fair market value of such property on the date of the contribution," and, looking to the Income Tax Regulations, defined "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." 1990 WL 141930 at *3. The court, accepting the reasoning of the Commissioner's expert witness that "the chances were very slight that a system that had as many problems as the LFMS software could be marketed successfully, and that no one would have paid anything for the rights to the LFMS software as it existed on the relevant dates," concluded that "petitioner's donations had no value." *Id.* 1990 WL 141930 at *7. By way of contrast, in *Cole,* 947 F.2d 313, which also turned on fair market value, the Eighth Circuit upheld a jury award of $2,000,000 for the conversion of a software program where the testimony of plaintiff's expert witness, "setting forth three different pricing structures that willing purchasers would have offered, ... provided the jury with adequate information to calculate Cole's damages with a reasonable degree of certainty." *Id.* at 319.

In the case at bar, Block testified that he could not suggest a fair market value, thus defined, for his software program. Principally that is because he does not intend to sell it to others. Rather, Block's business plan involves making the program's automated transaction-monitoring capacity available to companies for a per-transaction fee, with Block running the

system himself: acting, as it were, as his own Interlink. Nor was Block able to project at present an annual income stream, that being the second of the three generally recognized methods of valuing computer software programs.

Instead, Block utilized at the hearing the third method, the cost approach, referred to by the Tax Court in *Provitola* as the "replacement or development cost" or the "reproduction cost." 1990 WL 141930 at *4. In applying that method, Block relies primarily upon *In re Unimet Corp.*, 74 B.R. 156 (Bankr.N.D.Ohio 1987), which considered for corporate income tax purposes the value the debtor placed on software programs it acquired in the purchase of another company, in order to establish the new tax basis for depreciation or amortization amounts. The Bankruptcy Court noted the parties' agreement "that an appropriate methodology to calculate the value of the software is to compute the cost of reproducing the reusable lines of computer code," 74 B.R. at 168, although the parties "using similar methodology have arrived at figures in excess of $8,800,000 apart," *id.*, demonstrating that valuation methods, like statistics, can be made to say almost anything. The court performed its own analysis using the reproduction method, and calculated the "value of reusable/potentially reusable lines" at $3,364,200. *Id.* at 169.

Purporting to follow the Bankruptcy Court's reproduction cost formula in *Unimet*, Block came up with the amount of $863,173. *See* summation of counsel, Tr. 484–86. But that calculation, summarized in DX C, did not directly factor in the time Block actually spent developing the software while a consultant to Interlink. As counsel also argued in summation, Block testified that during the almost two years of his relationship with Interlink, he "worked approximately 66 percent of his entire week on creative work that went to

the enhancement, creativity, design of his software as opposed to the other one-third which was allocated to, to quote the record, babysitting Mr. Levovitz or otherwise dealing with client inquiries," *id.* at 487. Using his hourly rates of compensation, Block arrived at an alternative reproduction cost of $362,266.64. *Id.* at 489.

I accept in principle that reproduction cost is the appropriate evaluation method to use in this case. Block's program has not been sufficiently utilized to form the basis for income projections. I reject plaintiff's contention that I should find a market value of zero. Plaintiff bases that contention principally upon the *Provitola* case, but the only contemplated use for the software program in *Provitola* was its sale by the donee university to others, whereas Block intends to keep his program and charge others to use it. In that regard the case at bar more closely resembles the contemplated use of the software programs in *Unimet*, which the *Provitola* court distinguished on that ground:

> *Unimet*, a bankruptcy case, dealt with the valuation of computer programming codes which a corporation could reuse without modification in software systems developed for particular customers. The court held, under the facts of that case, that reproduction cost was a reliable indicator of value. The use of the computer code valued in *Unimet*, however, is quite different from the use contemplated in the instant case, *inasmuch as the LFMS software was to be held for sale, while the programming code in Unimet was not.* We consequently derive little guidance from *Unimet*.

1990 WL 141930, at *5 (emphasis added).

However, the alternative reproduction costs testified to by Block, $863,173 and $362,266.64, are so wildly different as to compel the inference that one of them is unacceptable. I conclude without difficul-

ty that the greater of these two amounts, purportedly based upon a extrapolation from a quite different case, must be rejected. The most reliable measure of this particular software program's actual reproduction (or development) cost is the number of hours Block actually spent developing it, multiplied by his hourly pay at the time.

But I also conclude that the amount of time Block claims for reproduction cost is exaggerated. Block bases his claim upon two-thirds of the entire, nearly two-year period he spent at Interlink. However, it stands to reason that development of the program was completed at some time before the end of that period, because Interlink had been using it before Block departed for the Sporn Group. Block kept no records itemizing how he spent his time. Block's description of the incessant demands Levovitz made upon him argues in favor of a greater percentage of Block's time devoted to such matters. So does Block's testimony that he was the only individual at Interlink competent to respond to client's inquiries and complaints about the running of the program.

I think that Block overstated the amount of time he spent on the program's development. Accordingly his claimed reproduction cost must be reduced.

In these circumstances, I hold that Block is entitled to security under Rule 65(c) in the amount of $200,000 with respect to the value of his software program.

The practical consequences of this holding are these:

1. Defendant remains subject to the restraints imposed by the first decretal paragraph of the TRO, for which the present bond of $5,000 stands as sufficient security.

2. The mandatory provisions of the second decretal paragraph of the TRO will come into effect twenty-four (24) hours after receipt by counsel for defendant, by hand or by telefax, of a written certification by counsel for plaintiff that security in an additional amount of $200,000, in a form complying with Local Civil Rule 65.1.1, has been posted.

3. If plaintiff posts the additional security called for by the preceding paragraph, the Court will enter a Confidentiality Order that will govern disclosures made by defendant in obedience to the TRO. The Court will also specify reasonable limitations upon the time that defendant must devote personally to his compliance with the mandatory provisions of the second decretal paragraph of the TRO.

The forgoing is SO ORDERED.